Good morning. My name is Heather McElroy and I represent the petitioner, Mr. Ali Osman Tifow. Counsel, I want to give you a little tip-off here. I have questions for your adversary. Okay. And I'm sure you're going to need some time to respond to his answers to my questions. Okay. So I would appreciate it if you would save some time so I could hear your responses. Absolutely. Thank you for that. This case challenges the propriety of the BIA's adverse credibility determination. But it's not a run-of-the-mill challenge. Here, right after Mr. Tifow testified in his merits hearing, the immigration judge delivered an oral opinion in which she found that Mr. Tifow was sincere, consistent, and credible. She specifically credited the basis for Mr. Tifow's past persecution and his fear of future persecution, finding that the USC militiamen attacked Mr. Tifow and his family on two separate occasions, killing some and driving the remaining out of Somalia. But then three days later, three days after she saw and heard Mr. Tifow testify, the judge changed her mind and issued a written opinion that contradicted the first one in many ways. For the first time, she questioned whether Mr. Tifow was even a member of the Mahiban clan, based on fairly blatant misreadings of the country conditions evidence. She also suddenly inferred ill will in that Mr. Tifow did not take his family with him when he fled the location of the second attack, although in her first opinion, she stated that there was no record evidence from which she could infer that. In what appears to be a triumphant exaltation of form over substance, the judge used two minor grammatical ambiguities to deprive Mr. Tifow of immigration relief. The BIA firm specifically crediting the IJ's findings on those two language issues. If you look at the critical facts here, that in a five-week period, Mr. Tifow lost three family members to attacks by USC militiamen, that the remaining family members were abruptly displaced and forced to flee to Kenya, that the family lived in Kenya for 11 years where they continued to face discrimination, when Mr. Tifow finally did come to the United States in July 2002, he didn't know any English, and that just five weeks after arriving here, he had a non-professional preparer help him complete his asylum application where he had to translate into a non-native language the traumatic events of over 11 years ago. Frankly, given all of this, it's remarkable that there weren't more ambiguities and inconsistencies, and that the only two problems that the IJ and the BIA identified turned on subtleties of the English language, the use of the first-person plural and a dangling date modifier, and were ones that he easily cleared up at the hearing. The record viewed as a whole lacks substantial evidence to support the adverse credibility finding. You might want to take Judge Kleinfeld's hand. All right. Thank you. I'll reserve the remaining time. Sure. Mr. Dupree. I mean, here you've got a situation where the immigration judge is more inconsistent than the applicant. I mean, bottom line. That's what I was going to ask about. Well, may it please the Court. Tom Dupree for the United States. I understand this is an unusual situation, that you do have the immigration judge begin to render an oral ruling, and then partway through she pre-terminated that and decided that she would submit a written ruling. I think the best way to explain what happened, and at the risk of sounding presumptuous, I think from time to time judges begin to write an opinion, realize it doesn't quite write, or that they really want to go back and double-check the evidence, and then after doing so, reach a different conclusion. Not good enough. She didn't begin to write it. She began to talk. Sure. And it's different because her talking was on the record. So what I would expect, it's kind of like when a court publishes an opinion and then publishes an amended opinion. I'd kind of like to see some obvious reason for the change. And I can't find, maybe you can tell me where it is, some explanation for why she changed her view. Well, Judge Konfield, I think you're absolutely right, Your Honor, in that this was not a situation where she sat down and started writing, started again. There's another thing that bothers me about that. Sometimes when a judge talks and then a judge writes, the writing, well, I recall, well, I won't get into that, but sometimes the writing may be more accomplished if it's a routine matter by staff. But you get a window into what the judge actually thinks by reading the judge's talk. And here she says in her talk, I've had the opportunity to observe the demeanor of the respondent. I find his testimony to be sincere and sufficiently consistent. Then it says the opposite in the writing. I don't know if she wrote what she wrote or if they have staff writers. Well, I think, Your Honor, I think that the fact that she began to render an oral opinion and then substituted a written opinion I think is something that cuts in our favor because the oral opinion, obviously, is rendered at the end of the hearing, on the spot. After hearing all the testimony, the judge simply says what she thinks and renders the ruling from the bench. What happened in the interim, obviously, is that she went back, she looked at the record. In all likelihood, she read the record, which she didn't have to. It's not obvious to me. If she'd have said so, I'd be a lot more comfortable with supposing that that's what happened. Well, I think it's a natural. Did she say what happened? Did she say why she changed her tune? No. Did she say, is there anything in the record to explain why this opinion seems to cut off before she's done talking? I think what happened was it was, again, analogous to the process of writing an opinion. And it's very interesting in that, as Your Honor has likely noted, she does go to court. It doesn't look like it because it cuts off. When you're doing that in an opinion, you don't usually just cut off in the middle of a sentence. Oh, she was reciting it. It looks more like the tape ran out. Well, at least it appears from the record it's something that was rendered orally. So she was speaking. And in all likelihood Don't they press a button on a tape recorder? Yes. If they want to go off the record, yes. But I think in this case, it seems what happened based on the transcript was that she was rendering a decision based on the testimony that she had just heard right at the conclusion. And as Your Honor has likely noted, there are numerous caveats and qualifiers in her oral decision where she says, well, I note this, but nonetheless, I'm going to give him the benefit of the doubt. Let me ask you a couple questions about those things. Sure. I was thinking about her concern on the dates, and they were 10 years before he testified. So I was sitting in my chair yesterday thinking about things that have happened to me within the last 5, 10, 15 years, big things, really big things. And very upsetting things. And I can't remember what year they were as they approached 10 years ago. I can remember what happened this year and last year and the year before. And I can remember all the events, but it's hard for me to remember. Was that 97? Was it 99? I don't know. So why is that so critical for his credibility? Because he obviously had a lot of time in which to prepare both his written submission as well as his testimony. So I think Your Honor's exercise of sitting in chambers and trying to remember is different in that here the Petitioner had the time to prepare both a written statement and then months and months and months between the time he submitted the written statement and the time he testified, during which he was represented by counsel. So I think that all of that time certainly gave him enough of an opportunity to try to nail down at least a year. Let me ask you about the other thing she was concerned about. Sure. She says it's just not credible that he gets a death threat and he runs away and he doesn't bring his family away with him. It seemed to me that went at least as much to character as it did to credibility, and it was a little hard to see the credibility. For one thing, if he thinks they know him and they just want to kill him, it might be the safe way to protect his family is to get away from his family. And for another thing, he might just be a coward and think, I don't want to get killed. My family can take care of themselves. Well, I agree, Your Honor, that those might be permissible or reasonable interpretations of the testimony, but I certainly think that the immigration judge's conclusion, that is to say that his testimony was simply implausible on his face. I don't understand why it's implausible. I mean, it seems like she's saying, well, he's not John Wayne, so I'm going to treat him like a liar. But not being John Wayne doesn't show he's a liar. Well, I respectfully disagree that he needed to be John Wayne in this situation. I think what was troubling the immigration judge was that you had a situation where, again, this follows the initial attack, where the armed militiamen allegedly came in and there was an attempted gang rape of his relatives and they shot his father in front of him. And then just a few weeks later, another band of marauders is about to come to his house, and he's told this while he's at his house, while his wife and his kids are all there, as far as we know, at the house. And I don't think the immigration judge was faulting him so much for simply running away, but for not, as it appears from the record, taking any steps to at least warn his family. It seems like a real sleazy guy, but why does that make him a liar? Well, I think the immigration judge felt that it was implausible, that even a non-John Wayne person at least would have said, see you later and I'm running out, as opposed to what he apparently did, which is just get the warning himself and then sneak out of the house and leave his wife and children to face the band of marauders. So I think it really goes to plausibility. But, of course, the immigration judge identified a number of bases. So even if Your Honor chooses not to credit that, which I do think is supported by substantial evidence, but there, of course, are other bases, such as the timeline issue and the fact that his written statement about being present at the second attack directly contradicts the testimony he offered at the hearing, where he said that he was absent. Okay. Let's get back to this. Sure. Now, as Judge Reimer said, the biggest inconsistency in the record is between what the I.J. said one time and what the I.J. said at another time. You've had a couple minutes to think about it now, a few minutes to think about it, and there's probably something else you wish you'd said in response to that question, so I'd like to hear it. Boy, I thought my first answer was good, but I'll try to give another answer. I think that another way of looking at it is that this is something I think that's commendable, in the sense that the immigration judge began reciting her opinion, having just heard the testimony, and at the point she reached where she decided to cut off and submit a written decision, she had enough doubts that she wanted to go back and look at the record and think about it for a few days. And so to that extent, I think it's a little unfair to effectively punish the judge or the agency, penalize the agency, by remanding simply because the immigration judge said, wait a minute, this is a complex case, I want to take a little bit of time to further reflect on this, to think about it, and she did so and came out with a different opinion. And if that's the basis for a remand, I think, again, it's not the right outcome in the sense that this is something that's correct. Kennedy. Is there anything in the written opinion, I might have missed it, that refers to the oral opinion, perhaps comments on it, explains why it's different? I was wondering if a staff writer wrote the written opinion and didn't even know about the oral opinion. Well, again, I don't think there's anything in the record that reflects that. Do they have staff writers? Well, immigration judges typically don't. The Board of Immigration Appeals does have a large contingent of staff attorneys and law clerks. Immigration judges, by and large, have very few resources, such as law clerks, to do their work. It's actually a recurring issue that often gets raised, that they don't have them. Again, I can't represent because I don't know in this case what happened. But generally, no, Your Honor. Let me ask a more substantive question. Sure. And that is that he actually, you know, the discrepancy in the timeline does have a sensible explanation, which was proffered, and that is that it was the revolution that started at the end of December, not the attack on Hammond's father. And nothing sort of seems like it's sensible to me. Well, Judge Reimer, I would point out, though, that it was not solely the written document that provided the basis for the contradiction. The Petitioner testified twice during the hearing when specifically asked when did this occur. He said December of 1990. He said it twice on the record. And it was only when that contradiction was pointed out to him that he then changed his testimony. So I think this discussion about a dangling modifier I think is a little misplaced, given that it's not solely the written document that provided the contradiction. There's two instances during his testimony when he said that. If I could make one more comment, I think one issue that was evidently troubling the Court was the fact that the immigration judge didn't offer an explanation for why she was coming out a different way. But I'm certainly not aware of anything in this Court's precedent that would require her to explain why she's taking a different view. And certainly in the context of a district court or a court of appeals offering an opinion on reconsideration, typically the Court will simply say the opinion, you know, published at so-and-so's site is withdrawn and we're substituting a different opinion. And I don't think that this Court necessarily feels obligated every time it takes a different view than its initial view to explain the reasons. The thing that's weird, I mean, here is that it's not a change of opinion on the law, let's say, where you've suddenly been, you get a motion to reconsider and you say, geez, I just simply got that Supreme Court case wrong. Here you make the, you switch entirely on an effect, a gut-level reaction. Well, I mean, that's more troubling because she sits there looking the guy in the face orally and says, you know, hey, he's sincere. I believe him. And then she goes back and three days later says, you know, the guy's just full of hot air. And that seems very strange. Well, I respectfully disagree with the idea that it's a gut-level reaction because I think in this case the adverse credibility judgment was based on record evidence, namely testimony and the documents. If the immigration judge's sole basis for adverse credibility were demeanor or she just didn't like the feel of it or he wasn't making eye contact or something along those lines, then I think Your Honor's point would have a lot of force. But I think here what the immigration judge was doing was focusing on the record, on the written testimony, on the documents. And she was looking at that to change her mind. So I do think it's actually more analogous to taking a different view of a case in that she went back, she read the records, she looked at the documents, and she reached a different conclusion, which I think is entirely reasonable and within her prerogative. Okay. Thank you very much. Thank you. Ms. McElroy. Thank you. I think as you rightly point out, you can't assume that because a few days went by that that second opinion is more reasoned or more intelligent than the first one. Well, that's the operative opinion. I mean, the bottom line is she could have said, like judges do all the time, they muse about things on the bench and go back and maybe have second thoughts about their musings informed by another look. Right. So why should we go behind the written opinion, which is the operative opinion, to just what she blabbered? Although the written opinion is the operative one and was the one reviewed by the BIA, what's striking is that there is actually less analysis, less explanation, less reference to the record in the second opinion than there is in the first. Again, why doesn't the operative opinion, the one that's exhausted to the BIA, stand on its own two feet? I mean, if you look at it and see whether it is good or bad, not by reference to what you said earlier, but by the respect to the operative opinion. And in that sense, the oral opinion is in the record. It's something that was there, and it at least sheds a little bit of light on what that judge may have been thinking, whether or not it's controlling. I'm not, you know, we don't submit that it is a controlling opinion, but it is something that can at least shed a little bit of light. Do you know what happened? Why it cuts off in mid-page? Were you there? No. I wasn't there, unfortunately. The record might show, even if you weren't. It looks like the tape cut off, but I can't tell. And honestly, Your Honor, I can't tell either. Did she explain it anywhere? No. I looked, and as you were talking to the Respondent as well, I was looking through the record. I can't. As far as any of the work I've done, I haven't seen anything that explains it anywhere in the record. I guess another explanation would be she finished, everything was fine, the tape was fine, and whoever did the Xeroxing just left off some pages. All right. Any way for us to tell? Not that I, not with any certainty, Your Honor. So what's wrong with it? The copy of the opinion you got is the same as what we have in the excerpt? It cuts off, the transcript cuts off right as she's discussing the country conditions evidence on the Monobon. Bottom of page 9 is a member of the tribe. Right. And then it says on 10, it also indicates that minority clans have limited access to education, dash, dash, and then she has a signature. Correct. That's exactly what I have. So looking at the operative opinion, what is your analysis as to what's wrong with that? There are generally, overall, it's that there are inconsistencies. Inconsistencies can exist for a variety of reasons. I think the fundamental problem with the operative opinion is that there's no explanation as to why the identified inconsistencies or those purported inconsistencies have anything to do with Mr. Tifo's credibility. They're minor and they just don't have any effect or weight. It's not totally minor that he said that the events actually occurred essentially back-to-back, when in fact they didn't. You know, I mean. Well, he was always consistent that the events occurred within three to four weeks of one another. He was consistent about the temporal relationship between the two attacks. The inconsistency is really the date that, you know, that four weeks began, whether that was the end of December 1990 or February 28, 1991. And, I mean, one thing I think that is also worth noting is that although he did testify twice at the hearing to that December 1990 date, he did so when his asylum application was in front of him. And that's the only date that's listed in the asylum application. And as soon as that was taken away and as soon as his lawyer said, no, you need to testify from memory, you need to be specific about the timeline, he was able to clearly and consistently from then on identify the date that his father was killed, that's February 28, 1991, and the date of that second attack is April 1. I mean, the law is clear that when you have that kind of inconsistency, that really is of less than substantial importance. I mean, the judge herself didn't write in the opinion that because of that date discrepancy, that somehow it's unlikely that that event didn't occur or that that first attack didn't happen or that he was likely to lie about it or, you know, he was omitting information. There was no analysis about that. And it was also strange in her second opinion that she didn't discuss at all the explanation that he proffered at the hearing, that this December 1990 date really did signify the end of the Civil War. And there was some confusion. It may have been a translation problem. And that December 1990 date, you know, is really well-known. It's a well-known date, too. It's a date that many Somali people, you know, think that's the date that you know, and the one that usually comes to mind is the date that generally all of these problems began. I just did want to make one point also about the problem that the judge identified about how she didn't or had some concern that Mr. Tipo fled his home without first warning his family. The question that was actually asked didn't have anything to do with whether or not he warned his family. The question he was asked was whether why he didn't flee with his family. So actually we don't have any evidence in the record that he didn't warn them. It's possible that he did warn them or he didn't have time to warn them, but to jump to the conclusion that he didn't warn them is actually not supported by evidence in the record. In conclusion, you know, there are so many reasons, as I mentioned before, that one could be inconsistent. One misspoke. One didn't understand something. One wasn't really thinking. But lying is probably not the most common one. And in asylum cases where petitioners are testifying to such traumatic events and they're using interpreters and translators, the risk of innocent inconsistencies is tremendous. And I think in this case we need to be really careful. Okay. Thank you. Thank you. Thank you. Yeah.   Thank you. Thank you. Thank you. Thank you.
judges: Hall, Rymer, Kleinfeld